## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEPHEN J. GILL and PARKER DETWEILER, <br><br> Plaintiffs, <br><br> v. <br><br> EVERYDAY DOSE, INC., <br><br> Defendant. | ) ) ) ) ) ) C.A. No. 24-1359-RGA ) ) ) ) ) |

## SUPPLEMENTAL STATEMENT PURSUANT TO THE COURT'S ORAL ORDER DATED JANUARY 28, 2026

### I. PRELIMINARY STATEMENT

I, Zack G. Sharpe, IV ("I" or "Sharpe"), a non-party and former attorney of record, respectfully submits this supplemental statement to assist the Court in its adjudication of the matter at issue, and in light of this new evidence, also humbly request this Court to reconsider its January 28, 2026, Order (D.I. 64)) requiring my in-person attendance at the February 5, 2026, show cause hearing. I make this request, not out of contempt or disregard for the Court's order but because I now have access to new information that was not in my possession, or the Court's possession when I made my initial request.

This submission is necessary to correct clear errors of fact and, fundamentally, to prevent a manifest injustice. The Court's mandate for physical presence is predicated on a perceived need to make "credibility determinations" between myself and lead counsel, Charles L. Slamowitz. However, the objective record—when viewed through the lens of Mr. Slamowitz's history of public misrepresentations, his self-proclaimed expertise in AI technology, and his persistent pattern of professional fraud—establishes that there is no "credibility dispute" requiring a physical confrontation. The documentary evidence, which I have recently obtained, demonstrates Mr. Slamowitz' misrepresentations.

As detailed herein, Mr. Slamowitz holds himself out to the public as a "Global Legal Authority" and a pioneer in the very technology at issue. On his public LinkedIn and Pitchbook profiles (Exhibit 2), he represents himself as an "Early investor in DraftWise," a nine-figure AI legal tech leader, and claims to have "advised on product strategy and legal positioning" during its early growth. He further claims that his current firm, "Slamowitz Sharpe," has existed since 2022—a time at which I was a senior associate at Littler Mendelson, P.C. and had no association

1

whatsoever with him. As outlined in my letter dated January 12, 2026, I had no association with Mr. Slamowitz outside of the brief window in which I agreed to provide background support for the instant matter—primarily as a subject matter expert in negotiating settlement agreements, a role Mr. Slamowitz explicitly asked me to assume because, in his own words, I am "better at this" than he is. (Exhibit 6).

This pattern of misrepresentation is a mockery of the judicial system. Mr. Slamowitz signed his Response to the Order to Show Cause using the name of a non-existent legal entity ("Slamowitz Sharpe"). Research confirms that neither "Slamowitz Sharpe" nor "Slam Legal LLC" are registered doing business as ("DBA") names in New York or Delaware (Exhibit 5). While I admit that I did not initially investigate whether Delaware's DBA rules mirrored New York's when I joined this matter as background support, I was eventually forced into a substantial drafting role only because of Mr. Slamowitz's chronic negligence and lack of timeliness, which local counsel Joseph Naylor, Esq. accurately depicts in his own statement (D.I. 46).

I handed over a "clean" draft in April solely because of my fears of reprisal from the Plaintiffs for malpractice and provided an explicit warning to verify references. That draft largely mirrored my original rough draft answering brief – first drafted in March 2025 – to Defendant's Motion to Dismiss the original complaint (Exhibit 1), but incorporated facts related to Plaintiff Detweiler who was not an original party. Mr. Slamowitz then assumed sole custody of the brief upon his return from Dubai on May 4, 2025. By his own admission, he purportedly identified "issues" with the filing in May but suppressed that knowledge from the Court for seven months. I fully appreciate the Court's obligation to investigate any fraud brought before it, but compelling me—an in-house counsel managing a high-stakes EPLI docket with crucial deadlines that pre-date the Order, who is currently filing a formal disciplinary complaint against Mr. Slamowitz with the New York State Bar—to travel six hours to sit beside an individual who has **clearly and unambiguously** used my name as a "human shield" against his own failures would be a manifest injustice.

## II. LEGAL STANDARD FOR RECONSIDERATION

Generally, reconsideration is appropriate to correct a clear error of law or fact or to prevent manifest injustice. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Reconsideration is warranted here because the Court's Order, through no fault of the Court and solely because of Mr. Slamowitz, rested on an incomplete understanding of the professional history, the "disparate sophistication" between counsel regarding the technology at issue, and the objective evidence that lead counsel is currently operating under a fraudulent legal fiction. Such evidence was not available to the Court, or to the moving party, at the time of the initial requests.

## III. ARGUMENT

### A. The Drafting History and Shared Drive Discrepancies Establish that Lead Counsel Introduced the Fabrications

The Court expressed concern regarding "whether and how" my use of AI was communicated to co-counsel. (D.I. 64). The objective record—specifically the timeline of Mr. Naylor's outreach and the contents of the firm's shared drive—resolves this question.

### 1. The Timeline of Negligence

As documented in the Statement of Joseph Naylor, Esq., Mr. Slamowitz's handling of this matter was defined by a chronic lack of timeliness. Mr. Naylor was forced to reach out repeatedly on April 14, April 16, April 21, April 29, and May 2, 2025, seeking a draft of the brief. (D.I. 46 at 2-3). Notably, I was on vacation during the mid-April period and returned to New York on or about April 21, 2025. Upon my return, I was surprised to find no draft had been prepared and reached out to Mr. Naylor myself to ask, "Where are we on this?" because I believed Mr. Slamowitz would have already provided a version to him. (Exhibit 7).

### 2. My Specific Verification Protocol

To the extent I used AI in connection with my March 2025 draft (Exhibit 1), it was strictly for **verification** of primary sources found on Google Scholar. I utilized Google's embedded AI and search tools such as Perplexity to find articles from reputable "Big Law" firms and academic sources that confirmed the case law I found was still good law. I did not use AI to *generate* authority. Consequently, my March draft remains 100% accurate and correctly cites cases—such as *Cornell Glasgow*—that were later hallucinated in the May filing after Mr. Slamowitz's "revisions." In fact, ***Cornell is the only case highlighted by the Court that appears in the brief at issue that also appears in my initial rough draft.***

### 3. April 29 Handoff and Intentional Obfuscation

On April 29, I provided Mr. Slamowitz with a draft outline and issued an explicit written warning via text: "**make sure all the references are correct - I didn't double check whether the cases are still good... Maybe ask Delaware counsel to verify.**" (Exhibit 4). Mr. Slamowitz replied: "**I see it [I] have it fix it.**" *Id.*

At 10:25 a.m. that same day, Mr. Slamowitz emailed me stating he was "currently flying to Dubai" and instructed me to handle settlement discussions because "you're better at this." (Exhibit 6). It is now clear that Mr. Slamowitz not only ignored my warning and failed to provide my message to Mr. Naylor, but he also used AI tools to "modify" my draft—his usual practice. Mr. Slamowitz did not return from Dubai and begin working on the brief until May 4, 2025 – a day before it was due. Upon receiving the Order to Show Cause in December, Mr. Slamowitz admitted to me: "**it's just how AI works, if you use it to revise a paragraph—it sometimes changes and fabricates things.**" Mr. Slamowitz would know, he is an early investor in the legal drafting software Draftwise. (Ex. 2.)

### 4. Evidence from the Shared Drive

Following his termination by Plaintiffs, Mr. Slamowitz was ordered to upload all case materials to a shared drive. I was unaware until the weekend of January 30, 2026, that I still maintain access to that drive. A review of that drive is revealing: my verified March 2025 draft is present, but the April draft I provided to Mr. Slamowitz—the last "clean" version before his Dubai trip—is conspicuously absent. This selective omission suggests an intentional effort to suppress the version of the brief that would prove the hallucinations were introduced during his final revision phase.

### B. Mr. Slamowitz's Standing as an AI Authority Precludes the Narrative of Accidental Misuse

Mr. Slamowitz is not a passive recipient of technology; he markets himself as a "Global Authority" in AI law and teaches NBI courses on "ChatGPT and Legal AI Guide for Litigators" (Exhibit 2). Given this disparate sophistication, Mr. Slamowitz was the party uniquely positioned—and ethically obligated—to catch the errors he now admits he identified in May 2025. His choice to withhold this discovery from the Court for seven months demonstrates that he is solely responsible for the "morass" the Court seeks to resolve.

### C. Documentary Evidence Refutes the Falsified "Removal" Timeline

In his Statement, Mr. Slamowitz falsely claims he "removed" me in May due to AI concerns. (D.I. 46 at 3). This is an objective fabrication. On April 21, 2025—the very day he confirmed his firm would draft the brief—Mr. Slamowitz was actively soliciting me to be included in a partnership report for litigation financiers to acquire new business. (Exhibit 3). Furthermore, the record shows I independently incorporated Sharpe PLLC on April 10, 2025. (Exhibit 10). While Sharpe PLLC and my d/b/a "Sharpe Counsel" are fully registered and searchable, neither Slam Legal LLC nor Slamowitz Sharpe exist in any state database—evidencing that Mr. Slamowitz has been operating under unauthorized names. (Exhibit 5).

Moreover, Mr. Slamowitz refused to remove me from his firm website and materials claiming that he was going to "wind down" my involvement at his own leisure. (Exhibit 11). Mr. Slamowitz would only remove me from his firm website after I threatened to report him to the New York State bar. *Id.* Upon information and belief, after finding the "coast was clear" Mr. Slamowitz began using the name Slamowitz Sharpe once again and published a new website that excludes my image but continues to present to the public as a partnership between the two of us. (Exhibit 2). The Court has no reason to believe the authenticity of anything Mr. Slamowitz puts forward.

### D. Preventing Manifest Injustice and Professional Displacement

Compelling my physical presence at the February 5 hearing would result in a manifest injustice. The Court's Order justifies the in-person mandate by citing the need for "credibility determinations" and the precedent in *Backertop Licensing LLC v. Canary Connect, Inc.* (D.I. 64). **However, when the full narrative history of Mr. Slamowitz's conduct is placed before the Court, it becomes clear that my presence would not add any additional value to the Court's determination beyond what I have provided in my submitted materials but would actively reward Mr. Slamowitz's pattern of professional harassment.**

#### 1. The Backertop Precedent is Distinguishable

In *Backertop*, the Court mandated the presence of a witness who was the "sole natural person" and owner of a corporate party suspected of using shell LLCs to perpetrate systemic fraud. I am a non-party and former attorney of record who provided an error-free draft in March (Exhibit 1) and issued a clear verification warning on April 29 (Exhibit 4). I have been fully cooperative and have documented every phase of my limited involvement. My testimony—which confirms what the documentary record already establishes—does not justify the "substantial expense" and professional displacement required for a six-hour round trip to Delaware.

4

### 2. Protection Against Ongoing Professional Fraud and Harassment

The most profound manifest injustice lies in the unintentional facilitation of Mr. Slamowitz's continued harassment of my professional reputation. Mr. Slamowitz continues to sign statements to this Court as "Slamowitz Sharpe"—a legal entity that does not exist and has never been a registered DBA (Exhibit 5). He has persisted in this fraud despite my repeated demands that he cease using my name to provide his "Slam Legal" brand with a veneer of "prestige."

Moreover, Mr. Slamowitz has used this false association to shield himself from the consequences of his own negligence. I have been contacted by his former clients—individuals whom he has "ghosted"—who reach out to me under the false impression that I am his partner. Mr. Slamowitz is effectively using my credentials as a human shield against malpractice claims and client grievances. I fear that if this situation is not remedied I will find myself subject to a malpractice lawsuit from one of his clients despite having no involvement in his affairs. The instant case is the exact scenario that I feared. To this day, his clients continue to reach out to me through LinkedIn asking if I am involved with Mr. Slamowitz because of the "Slamowitz Sharpe" name that he strangely and unlawfully covets.

### 3. Pending New York Bar Grievance

By the time this motion is filed, I will have submitted a formal disciplinary complaint against Mr. Slamowitz with the New York State Bar for his unauthorized use of my name, his misrepresentations to this Court, and his fraudulent claims regarding the founding of his firm. Compelling an attorney to travel hundreds of miles to sit beside an individual who is the subject of their own pending Bar grievance for professional fraud is an extraordinary and traumatic burden.

## IV. CONCLUSION

I humbly submit this evidence to the Court to assist in its analysis and submit that my physical presence is not required for the Court to determine that lead counsel—an AI expert who admitted to discovering fabrications in May and concealing them—is the culpable party. He has misled this Court from the moment he was admitted pro hac vice and continues to do so now. I respectfully request that the Court permit me to appear remotely or excuse my appearance entirely. Unfortunately, I will be otherwise forced to choose between my professional obligations involving the EEOC and the Southern District of New York and appearing in person on February 5, 2026.

Respectfully submitted,

Zack G. Sharpe, IV