IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHEN J. GILL and PARKER DETWEILER, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 24-1359-RGA-EGT |
| EVERYDAY DOSE, INC, | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

Courts around the country are grappling with the increasing use of artificial intelligence ("AI") to prepare briefs and other court filings, particularly because AI is known to fabricate cases and other legal authority ("AI hallucinations"). AI hallucinations distract from the merits of litigation, waste party and court resources, damage attorney credibility and, at some point, undermine confidence in the judicial system. To be clear, using AI to assist with legal tasks is not on its own sanctionable. But when attorneys use AI to prepare briefs or other papers submitted to the Court without proper oversight, as was the case here, they have failed to conduct a reasonable inquiry into the law and facts as required by Federal Rule of Civil Procedure 11(b).

## I. BACKGROUND

This case is ultimately about a failed business relationship between Defendant Everyday Dose, Inc. ("Defendant") and Plaintiffs Stephen J. Gill and Parker Detweiler (together, "Plaintiffs"), but shortly after an amended complaint was filed, the unsupervised use of AI derailed this case from the merits. The following factual background describes the series of events that brought AI to the forefront of this litigation.[1]

[1] The Court has set forth a detailed factual background in a prior decision. (*See* D.I. 37).

**A. Plaintiffs Submit an Answering Brief Containing AI-Hallucinated Authority**

On December 11, 2024, Plaintiff Stephen Gill ("Gill") filed this breach-of-contract action against Defendant. (D.I. 1). On February 18, 2025, attorneys Zack G. Sharpe, IV and Charles Slamowitz were admitted *pro hac vice* to represent Gill, and Joseph S. Naylor replaced Gill's previous Delaware counsel on March 27, 2025. (*See* D.I. 13 (so ordered by Judge Richard G. Andrews on February 18, 2025); *see also* D.I. 18). The First Amended Complaint was filed shortly thereafter, adding Parker Detweiler as a Plaintiff. (D.I. 21). Defendant then filed a partial motion to dismiss on April 14, 2025 (D.I. 27), which Plaintiffs opposed on May 5, 2025 (D.I. 31). Plaintiffs' answering brief in opposition to the motion was signed and filed by Mr. Naylor, with Mr. Slamowitz (but not Mr. Sharpe) included in the signature block. (D.I. 31).[2] That answering brief contained fictitious cases and false statements of law as hallucinated by AI.

On December 11, 2025, the undersigned issued an order for Plaintiffs' attorneys to show cause as to why they should not be sanctioned under Federal Rule of Civil Procedure 11 for their use of fictitious authority in opposing Defendant's motion to dismiss. (*See* D.I. 38). In the show-cause order, the Court identified the specific AI hallucinations found in Plaintiffs' answering brief:

> In Plaintiffs' answering brief (D.I. 31) in opposition to Defendants' motion to dismiss, the Court has identified numerous AI-related errors. First, and particularly damaging, the brief includes two citations to cases that are non-existent: *IBCC, LLC v. Maury*, 2019 WL 1979984, at *4 (D. Del. May 3, 2019), and *Wheatley v. IBM*, 2013 WL 389135, at *6 (Del. Super. Jan. 29, 2013). (D.I. 31 at 12 & 19). Plaintiffs' answering brief also includes five case citations where the explanatory parenthetical includes quoted language that does not appear in the cited case. (D.I. 31 at 11-12 (*Kuhn Constr. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 530 (D. Del. 2012) (to plead promissory fraud, plaintiff must allege facts showing "the promisor had no intention of performing at the time

2 Mr. Sharpe was not included in the signature block or otherwise identified in the answering brief, but he remained counsel of record until after briefing concluded. (D.I. 31; *see also* D.I. 35 (Mr. Sharpe withdrawing as counsel several days after Defendant filed its reply)).

> the promise was made" and must inject precision into allegations by stating the time, place, and content of the false promise); D.I. 31 at 12 (*Addy v. Piedmonte*, 2009 WL 707641, *17 (Del. Ch. Mar. 18, 2009) ("a contracting party's purposeful concealment or false statement about a material fact or its future intentions may support a fraud claim"); D.I. 31 at 13 (*Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A3d 35, 50-51 (Del. Ch. 2015) ("a promise made with an existing intent not to perform is an actional misrepresentation"); D.I. 31 at 15 (*Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) ("Alternate pleading is permissible: a party may simultaneously allege breach of contract and, in the alternative, promissory estoppel."); D.I. 31 at 16 (*Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (promissory estoppel "operates to create a binding promise where no formal contract exists," to avoid injustice)).

(D.I. 38 (footnotes omitted)). The Court also ordered the attorneys to specifically indicate "whether (and how) AI was used in the drafting of Plaintiffs' answering brief" and "whether (and to what extent) AI was used in the drafting of any prior pleadings or filings." (*Id.* at 3).

### B. Plaintiffs' Attorneys Respond to the Show-Cause Order

In response to the show-cause order and later order scheduling the show-cause hearing, Messrs. Naylor, Slamowitz and Sharpe provided conflicting interpretations of the events leading up to the filing of the answering brief at issue.

Mr. Naylor, who continues to serve as Delaware counsel for Plaintiffs, stated that he does not and has never used AI to prepare or edit documents submitted to the Court. (D.I. 42 at 3-4). Based on his initial impression of Mr. Slamowitz and Mr. Sharpe, Mr. Naylor believed them to be intelligent and experienced attorneys. (*Id.* at 2). After Mr. Slamowitz indicated that his firm would handle the answering brief, Mr. Naylor apparently repeatedly followed up with Mr. Slamowitz regarding the status of the brief – requests that largely went ignored. (*Id.* at 2-3). On the day the brief was due, Mr. Slamowitz finally sent Mr. Naylor the draft brief at 9:29 a.m., instructing him to "file with the Court right away." (*Id.* at 3). Mr. Naylor said that he reviewed and revised the

brief that day but, in the interest of time, did not check the cited cases or quoted text because they "appeared properly cited under Blue Book style" and to be "correct statements of law." (*Id.*). Mr. Naylor also indicated that he spoke independently with Mr. Slamowitz and Mr. Sharpe after receiving the show-cause order. (*Id.* at 5). According to Mr. Naylor, Mr. Slamowitz acknowledged that the brief he sent Mr. Naylor contained the false statements identified by the Court but denied creating or adding the AI hallucinations – he instead pointed to Mr. Sharpe as the brief's original drafter. (*Id.*). As for Mr. Sharpe, he told Mr. Naylor that he did not draft the final brief but acknowledged using AI to draft early "outlines" of the answering brief, which he acknowledged contained "AI-generated errors." (*Id.* at 5-6).

Mr. Slamowitz attempted to deflect blame onto Mr. Sharpe for the AI hallucinations and offered various, difficult-to-decipher statements regarding his own use of AI. (*See generally* D.I. 46, Ex. 1). Instead of denying that AI was used in drafting the brief, Mr. Slamowitz said that he "did not personally use [AI] tools to generate legal authorities, citations, or explanatory parentheticals in the answering brief" and that to his knowledge, "[AI] tools were not used in the drafting of any other pleadings or filings submitted in this action." (*Id.* at 2-3; *but see id.* at 3 ("To the limited extent [AI] tools were used within the firm, such use was non-substantive and incidental, did not involve the generation of legal authorities or citations, and was not intended to mislead the Court.")). Mr. Slamowitz then indicated that his recent investigation revealed that his co-counsel, Mr. Sharpe, "used [AI] tools during preliminary, outline-level drafting in late April 2025 into May 2025" – and Mr. Slamowitz claimed that he was unaware that AI tools were used "during those stages." (*Id.* at 2-3). Finally, Mr. Slamowitz also attempted to deflect some blame onto Mr. Naylor, stating that Mr. Naylor "actually provide[d] substantive work, not mere filings like a courier" and was the one that "ultimately signed and filed" the answering brief with the

Court. (*Id.* at 4 ("Upon learning of the deficiencies identified by the Court, [Mr. Slamowitz] advised the client that he did not wish to continue working with [Mr. Naylor] . . . .")).

Having received statements from Messrs. Naylor and Slamowitz that implicated Mr. Sharpe, the Court set a hearing for February 5, 2026 for all three attorneys to attend. (D.I. 50). In response to the order requiring his attendance, Mr. Sharpe submitted various statements requesting excusal from the show-cause hearing and largely deflecting blame back onto Mr. Slamowitz. (*See* D.I. 55, 62, 69 & 71).[3] In his first submission, Mr. Sharpe acknowledged using AI tools in connection with the preliminary draft but emphasized that Mr. Slamowitz was primarily responsible for the answering brief. (D.I. 55 at 2-4 (stating that he only assisted with the preliminary draft as a "professional courtesy")). Attaching text messages between himself and Mr. Slamowitz, Mr. Sharpe stated that he passed the initial draft off and told Mr. Slamowitz to "make sure all the references are correct." (D.I. 55 at 3-4; D.I. 55, Ex. A). In a later submission, Mr. Sharpe attached the supposed early draft that he prepared[4] in an attempt to argue that the AI hallucinations originated elsewhere because his draft was "100% accurate and correctly cites

---

[3] Instead of simply attending the hearing after the Court denied his initial request for excusal (D.I. 56), Mr. Sharpe ramped up his efforts, leveling a series of accusations against Mr. Slamowitz in the process (D.I. 62 & 69). In one submission, Mr. Sharpe argued that requiring his attendance at the hearing would be a "manifest injustice" because of Mr. Slamowitz's "history of public misrepresentations, his self-proclaimed expertise in AI technology, and his persistent pattern of professional fraud." (D.I. 69 at 1-2). Mr. Sharpe stated that he intended to file a disciplinary complaint against Mr. Slamowitz for refusing to remove his name from the firm name or website, arguing that compelling Mr. Sharpe to travel "hundreds of miles to sit beside an individual who is the subject of their own pending Bar grievance for professional fraud is an extraordinary and traumatic burden." (*Id.* at 5). All of Mr. Sharpe's requests for excusal – including one surprising joint submission by Mr. Sharpe and Mr. Slamowitz (D.I. 71) – were denied. (D.I. 56, 64, 68 & 72).

[4] Particularly egregious, Mr. Sharpe submitted the draft brief on the public docket without even a confidentiality designation. Ultimately, the draft filed by Mr. Sharpe was removed from the docket upon request by Plaintiffs' current counsel. And contrary to his statement that the brief was "100% accurate and correctly cites cases," the draft brief submitted by Mr. Sharpe also contained AI-hallucinated authority.

cases." (D.I. 69 at 3). Emphasizing that Mr. Slamowitz "markets himself" as a "Global Authority" in AI law, Mr. Sharpe accused Mr. Slamowitz of being the one to introduce the AI hallucinations by using AI tools to "modify" his draft the day before it was due. (*Id.* at 3-4).

### C. Mr. Naylor and Mr. Slamowitz Testify at the Show-Cause Hearing

On February 5, 2026, the Court held its show-cause hearing, which both Mr. Naylor and Mr. Slamowitz attended. (*See* D.I. 75). The Court began with Mr. Slamowitz.

Despite acknowledging that "[w]e did cite the [hallucinated] cases," Mr. Slamowitz first argued that he should not be held responsible because he did not sign or file the answering brief. (D.I. 75 at 5:8-6:23 (referencing *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120 (1989))).[5] Mr. Slamowitz testified that Mr. Sharpe created the initial draft, that Mr. Sharpe introduced the AI hallucinations into the draft and that he could not recall when Mr. Sharpe told him that AI was used in preparing the draft. (*Id.* at 8:1-13:1 & 39:25-40:4). When asked whether he used AI in connection with the answering brief, Mr. Slamowitz provided several evasive answers and ultimately admitted that an unnamed "staff member" of his firm used AI in revising the brief. (*Id.* at 13:2-14:5, 15:25-16:6, 17:10-18:8 & 19:16-23). Mr. Slamowitz further testified that he used AI in some capacity in drafting his response to the Court's show-cause order because Mr. Naylor's decision to file his own response somehow rendered Mr. Slamowitz "under the gun." (*Id.* at 29:4-31:17; *see also id.* at 32:1-13 ("I was in Saint Barts respectfully and I drafted this whole [statement] to submit to the Court timely.")). Mr. Naylor's counsel cross-examined Mr. Slamowitz regarding

---

5 The Court, however, quickly pointed out that the 1993 amendment to Rule 11 permits sanctions for non-signatories of filings. (*Id.* at 7:1-4); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation."); *King v. Whitmer*, 71 F.4th 511, 531-32 (6th Cir. 2023) (upholding Rule 11 sanctions against an attorney who did not sign the sanctionable pleading).

his failure to provide the draft answering brief until day it was due and to confirm that the AI hallucinations were in the draft that Mr. Slamowitz provided to Mr. Naylor. (*Id*. at 46:14-59:10).

After Mr. Slamowitz's testimony concluded, Mr. Naylor provided a statement through counsel he retained for the show-cause hearing – a statement that tracked Mr. Naylor's written submission. (D.I. 75 at 59:18-72:23; *see also* D.I. 42). Mr. Naylor's counsel also explained that Mr. Naylor has taken remedial action in response to the AI incident, including (1) self-reporting to his firm's management, (2) adjusting his retention agreement to specifically address the use of AI, (3) researching and authoring an AI policy for his firm and (4) sharing his experience at a firm-wide town hall and explaining the firm's new AI policy. (*Id*. at 69:2-71:1). Mr. Naylor then testified and reiterated the statements made by his attorney (and his previous written statement). (*Id*. at 73:3-91:9). Mr. Naylor acknowledged his responsibility to confirm the authenticity of authorities filed with the Court and indicated that he has implemented a multi-tiered system to ensure that he never files another document with similar errors. (*Id*. at 89:20-90:5). He sincerely apologized to the Court and to opposing counsel for the events that ensued from the brief's filing, explaining that the experience has been humbling and embarrassing. (*Id*. at 92:20-93:9).

Mr. Sharpe did not attend the show-cause hearing. At the end of the hearing, Mr. Naylor and Mr. Slamowitz both confirmed that Mr. Sharpe was not present in the courtroom, and the Court took the issue of sanctions under advisement. (D.I. 75 at 96:14-25).

## II. **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 11, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for

establishing new law." FED. R. CIV. P. 11(b)(2); *Napier v. Thirty or More Unidentified Fed. Agents, Emps. or Officers*, 855 F.2d 1080, 1091 (3d Cir. 1988) ("To satisfy the affirmative duty imposed by Rule 11, an attorney must inquire into both the facts and the law before filing papers with the court."). Finding cause for Rule 11 sanctions "requires only negligence," *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 147 (3d Cir. 2024) (emphasis omitted), and involves an evaluation of "reasonableness under the circumstances," *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991). Under the negligence standard, "courts can sanction lawyers for what they should have known, not just what they knew." *Wharton*, 95 F.4th at 148 ("Lawyers cannot avoid sanctions by unreasonably failing to investigate whether their factual contentions have support.").

Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated" and may include "nonmonetary directives" or "an order to pay a penalty into court." FED. R. CIV. P. 11(c)(4); *see also* FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; referring the matter to disciplinary authorities."). When monetary sanctions are imposed *sua sponte* under Rule 11, a court must first issue a show-cause order, FED. R. CIV. P. 11(c)(5)(B), requiring "an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)," FED. R. CIV. P. 11(c)(3).

## III. DISCUSSION

Each of Messrs. Naylor, Slamowitz and Sharpe violated Rule 11 in connection with the answering brief here. AI hallucinations in the legal field are well known. Given that Mr. Sharpe

and Mr. Slamowitz used – or knew that AI was used – in drafting the brief, they should have known that it could contain hallucinated authorities and conducted a reasonable inquiry accordingly.[6] And although Mr. Naylor was not aware that AI was used to draft the brief, he still had a responsibility to ensure the brief's accuracy. *OTG New York, Inc. v. OTTOGI Am., Inc.*, No. 24-CV-07209 (BRM) (JRA), 2025 WL 2671460, at *3 (D.N.J. Sept. 18, 2025) (noting that it is "axiomatic that attorneys' certifications reflect that any cited authorities are correct and verified to the best of their ability"). Having found that all three attorneys violated Rule 11, the Court now turns to the issue of what sanctions are appropriate.

**A. Mr. Naylor**

After considering the attorneys' submissions and sworn testimony of record, the Court finds that imposing sanctions upon Mr. Naylor would be "more severe than reasonably necessary to deter repetition of the conduct." FED. R. CIV. P. 11 advisory committee's note to 1993 amendment. Mr. Naylor, who has been a member of the Delaware bar since 1999 without disciplinary action, provided a clear and credible recitation of events leading to the brief's filing. The Court is persuaded that the AI-hallucinated authority did not originate from Mr. Naylor or his firm. And when the brief was finally provided to Mr. Naylor on the morning it was due, neither Mr. Slamowitz nor Mr. Sharpe appear to have provided any indication that AI was used in its drafting. At the hearing, Mr. Naylor sincerely apologized to both the Court and opposing counsel for the events that have ensued since the brief's filing. And without the Court's prompting, Mr. Naylor engaged in remedial conduct, including reporting himself to his firm's management,

---

[6] Considering his evasive series of answers on the topic, admission that he uses AI within his firm and admission that he personally used AI in drafting his response to the show-cause order, the Court believes that Mr. Slamowitz did personally use – or allowed his staff to use – AI to draft or revise the answering brief. (*See* D.I. 75 at 13:2-14:5, 15:25-16:6, 17:10-18:8, 19:16-23 & 29:4-31:17). Any testimony to the contrary is not credible.

adjusting his retention agreement to specifically address use of AI, researching and authoring an AI policy for his firm and sharing his experience at a firm-wide town hall.

Mr. Naylor is not, however, without fault. Mr. Naylor signed and filed a brief containing AI-hallucinated authority. "[A]s the saying goes, the buck stops with him." *Bunce v. Visual Tech. Innovations, Inc.*, No. CV 23-1740, 2025 WL 662398, at *1 (E.D. Pa. Feb. 27, 2025). Although the Court is cognizant that outside counsel often provides draft legal filings to Delaware counsel shortly before they are due, Mr. Naylor's role as Delaware counsel in this case does not absolve him of his responsibilities under Rule 11 to ensure that legal filings are supported by existing law. *Cf. Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 498-99 (D. Wyo. 2025) (sanctioning local counsel after outside counsel submitted brief containing AI-hallucinated cases); *Williams v. Ests. LLC*, 663 F. Supp. 3d 466, 484 (M.D.N.C. 2023) (imposing monetary sanction on local counsel serving as "rubber stamp" to outside counsel). To the extent that Mr. Naylor ever files another document with this Court containing AI hallucinations, whether in this action or another, the Court will not be so lenient. But given Mr. Naylor's credible testimony, significant remorse and substantial experience practicing in Delaware without issue, the Court suspects such an occurrence is unlikely. For at least these reasons, the Court declines to impose sanctions upon Mr. Naylor.

**B. Mr. Slamowitz**

Mr. Slamowitz is a different story. Although he at least attended the show-cause hearing (unlike Mr. Sharpe), Mr. Slamowitz provided the Court with nothing but meandering (sometimes bombastic) attempts to deflect blame onto others and minimize his role in drafting the answering brief. *See Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 449 (S.D.N.Y. 2023) ("But if the matter had ended with Respondents coming clean about their actions[,] . . . the record now would look quite different."); *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1355 (S.D. Fla. 2025)

("A reasonable attorney, when made aware that his practices were leading to hallucinated cases and quotations, immediately changes course."). Without admitting fault except for failing to check citations, Mr. Slamowitz claimed that Mr. Sharpe introduced the AI-hallucinated authority, that some unnamed "staff member" of his may have used AI to revise the brief and that the ultimate responsibility should fall on Mr. Naylor for signing and filing the brief. As for remedial measures, Mr. Slamowitz testified only that he removed the unnamed "staff member" from his firm and implemented an unspecified "internal protocol" to catch AI-hallucinated authority going forward.

As explained above, the Court finds it difficult to believe Mr. Slamowitz's claim that he did not use AI in drafting or revising the answering brief at issue. (D.I. 46, Ex. 1 at 2; *see also* D.I. 75 at 13:25-14:5 ("I hardly use AI.")). After all, Mr. Slamowitz admitted to using AI in preparing his response to the show-cause order. (*See* D.I. 75 at 29:4-30:6 ("Yes, Your Honor, I helped – I started to outline using AI for the final one.")). And Mr. Slamowitz's purported expertise in AI makes it all the more incredible that he allowed AI hallucinations to end up before this Court.[7] Had he simply admitted his role in submitting the AI-hallucinated authority at issue and expressed contrition, Mr. Slamowitz may have avoided sanctions. But by deflecting questions about his involvement, attempting to cast blame onto everyone else and using AI to draft his response to the show-cause order without correcting the gibberish it generated,[8] Mr. Slamowitz

---

[7] Mr. Slamowitz markets himself as "[e]lite legal counsel for AI." Homepage, SLAM LEGAL LLC, https://slamlegal.com/ (last visited Mar. 31, 2026) [https://perma.cc/2FRA-EF7L].

[8] As the Court noted during the hearing (*see* D.I. 75 at 29:7-30:19), the curious phrasing of Mr. Slamowitz's response to the show-cause order reads like AI-generated content. (*See, e.g.*, D.I. 46, Ex. 1 at 3 ("Just like Respondent, Mr. Sharpe did not sign the answering brief, or any of the pleadings to the Court. Mr. Sharpe further provided her [sic] did not verify the case cite contents at the filing, as Respondent also trusted co-counsel that spent hours and months on the case before they signed, verified and filed alone without Respondent or Mr. Sharpe in this case."); *id.* at 5 ("This is beyond the fraud argument, which was not the crux, however, Swartz Campell and client all agreed on filing after conferring near the deadline but certainly was told can be made hereto.")).

showed a profound lack of remorse and disregard for his professional responsibilities. *See McCarthy v. United States Drug Enf't Admin.*, 171 F.4th 245, 250-52 (3d Cir. 2026) (reprimanding attorney for submitting AI-hallucinated authority and "doubling-down" on conduct by characterizing legal research as "good faith effort" and misrepresentations as "immaterial").

The Court finds that monetary and non-monetary sanctions against Mr. Slamowitz are necessary to "deter repetition of the conduct." FED. R. CIV. P. 11(c)(4). Considering sanctions imposed for "comparable conduct by others similarly situated," *id.*, the Court will impose a monetary sanction of $3,000. *See Gardner v. Combs*, No. 2:24-CV-07729, 2025 WL 3632704, at *4 (D.N.J. Dec. 15, 2025) (imposing $6,000 monetary sanction for citation to AI-hallucinated authority); *OTG*, 2025 WL 2671460, at *3 (imposing $3,000 monetary sanction for citation to AI-hallucinated authority); *Bunce*, 2025 WL 662398, at *4 (imposing $2,500 monetary sanction for citation to AI-hallucinated authority); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-CV-281, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024) (imposing $2,000 monetary sanction for citation to AI-hallucinated authority). The Court will further direct the Clerk of Court to serve a copy of this Order on the appropriate attorney licensing entities of the States of New Jersey and New York, where Mr. Slamowitz is barred. *See Bevins v. Colgate-Palmolive Co.*, No. CV 25-576, 2025 WL 1085695, at *7 (E.D. Pa. Apr. 10, 2025). Lastly, to the extent he seeks *pro hac vice* admission before the District of Delaware again, Mr. Slamowitz shall include this Order with any such motion for admission.

### C. Mr. Sharpe

As with Mr. Slamowitz, Mr. Sharpe "doubled down" and attempted to divert blame onto others instead of "coming clean" about his actions. *See Mata*, 678 F. Supp. 3d at 449. In his first submission, Mr. Sharpe acknowledged using AI tools in connection with the preliminary draft but

emphasized that Mr. Slamowitz was primarily responsible for the answering brief. (D.I. 55 at 2-4). In a later submission, Mr. Sharpe represented that the draft brief he allegedly prepared and sent to Mr. Slamowitz was "100% accurate and correctly cites cases." (D.I. 69 at 3). But this Court's review of the draft brief – which was removed from the docket at Plaintiffs' request – also revealed AI-hallucinated authority. And, before the answering brief was filed, Mr. Sharpe never told Mr. Slamowitz or Mr. Naylor that he used AI in generating his draft brief. Mr. Sharpe was at least partially responsible for introducing AI hallucinations in the answering brief.

As an attorney of record that participated in its drafting, Mr. Sharpe was responsible for ensuring that the answering brief was supported by fact and law. *See Bunce*, 2025 WL 662398, at *1 ("But unlike the cases Mr. Rajan cited, Rule 11 is not artificial; it imposes a real duty on lawyers – not on algorithms – to 'Stop, Think, Investigate and Research' before filing papers either to initiate a suit or to conduct the litigation." (cleaned up)). But he did not bother to check the cases he cited; he punted that responsibility to Mr. Slamowitz. And at no point in his erratic responses to the Court's order did Mr. Sharpe admit to wrongdoing; nor did Mr. Sharpe ever apologize or take any remedial action. *Cf. Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 351 (E.D.N.Y. 2025) ("The Court's sanction is lower than in many other similar cases in part because of Ms. Hovsepyan's candor and sincere regret."). Instead, Mr. Sharpe bombarded the Court with repeated submissions (and phone calls) and attempted to shift the blame to Mr. Slamowitz. Mr. Sharpe's serial, unprompted submissions and eventual failure to attend the show-cause hearing wasted the Court's time and flouted the Court's authority, ultimately requiring the undersigned to certify facts for contempt proceedings against Mr. Sharpe. (*See* D.I. 76).

The Court finds that monetary and non-monetary sanctions against Mr. Sharpe are necessary to "deter repetition of the conduct." FED. R. CIV. P. 11(c)(4). Considering sanctions

imposed for "comparable conduct by others similarly situated," *id.*, the Court will impose a monetary sanction of $3,000 and will direct the Clerk of Court to serve a copy of this Order on the appropriate attorney licensing entity of the State of New York, where Mr. Sharpe is barred. *See Gardner*, 2025 WL 3632704, at *4; *OTG*, 2025 WL 2671460, at *3; *Bunce*, 2025 WL 662398, at *4; *Gauthier*, 2024 WL 4882651, at *3; *Bevins*, 2025 WL 1085695, at *7. Lastly, to the extent he seeks *pro hac vice* admission before the District of Delaware again, Mr. Sharpe shall include this Order with any such motion for admission.

* * *

AI is a useful tool that is assuming an ever-expanding role in human life. But humans are still responsible for overseeing the tool and verifying its output, and attorneys are still bound by the Federal Rules to ensure their AI-crafted arguments are warranted by existing law and supportable facts. Where, as here, attorneys blindly rely on AI to accurately present legal arguments to the Court, they do so at their own peril. Messrs. Naylor, Slamowitz and Sharpe all violated Rule 11(b)(2) in submitting to this Court a brief containing AI-hallucinated authority. The appropriate sanctions will issue.[9]

## IV. CONCLUSION

For the foregoing reasons, the Court declines to impose sanctions upon Mr. Naylor under Rule 11(c). Given their greater culpability and lack of remorse, however, the Court finds that

---

[9] In the show-cause order, the Court also cited American Bar Association Model Rule of Professional Conduct 3.3(a)(1) ("Model Rule 3.3(a)(1)") as a basis for sanctions. (D.I. 38 at 2); *see also* D. DEL. LR 83.6(d). Because sanctions against Messrs. Slamowitz and Sharpe are warranted under Rule 11, as discussed herein, the Court does not separately analyze whether sanctions are appropriate for them under Model Rule 3.3(a)(1). And, as discussed herein, Mr. Naylor's conduct was not knowing, which is required for a violation of the Model Rule.

sanctions under Rule 11(c) are appropriate for Mr. Slamowitz and Mr. Sharpe. THEREFORE, IT IS HEREBY ORDERED that:

1. Mr. Slamowitz shall pay a fine of $3,000, to be made payable to Clerk, U.S. District Court within fourteen (14) days of this Order;

2. Mr. Sharpe shall pay a fine of $3,000, to be made payable to Clerk, U.S. District Court within fourteen (14) days of this Order; and

3. To the extent that either Mr. Slamowitz or Mr. Sharpe seeks *pro hac vice* admission to the United States District Court for the District of Delaware again, each shall be required to include a copy of this Order with any such motion seeking *pro hac vice* admission.

IT IS FURTHER ORDERED that the Clerk of Court shall serve a copy of this Order on the appropriate attorney licensing entities of the States of New Jersey and New York.

Dated: November 9, 2026

UNITED STATES MAGISTRATE JUDGE